**UNITED STATES of America**

v.

**Kermit Leroy PHELPS.**

**UNITED STATES of America**

v.

**Pete UEBELSTEADT.**

**Crim. Nos. 5526, 5527.**

United States District Court
N. D. Florida,
Pensacola Division.

April 4, 1962.

C. W. Eggart, Jr., Asst. U. S. Atty., Pensacola, Fla., for plaintiff.

Holsberry & Emmanuel, Pensacola, Fla., for defendants.

DE VANE, District Judge.

*Findings of Fact*

These two cases were consolidated for hearing on motions to suppress filed by each defendant, and since the cases are so closely linked together, they will be jointly considered and disposed of in this Memorandum-Decision.

The evidence discloses that on May 16, 1961, State Beverage Agent B. J. Harris received information from a confidential and reliable source that on the night of May 16, 1961, at approximately 8:30 P. M. a colored person driving a 1954 Plymouth Sedan would go to the residence of Pete Uebelsteadt to obtain a quantity of moonshine whiskey, and that upon the arrival of the 1954 Plymouth Sedan, Pete Uebelsteadt would leave his home in his G.M.C. pick-up truck and shortly thereafter return with the whiskey and deliver it to said colored person. Based upon this information, two or more investigating officers on May 16, 1961, at about 8:00 P.M. positioned themselves in the proximity of Pete Uebelsteadt's premises in order to observe the contemplated activity. Shortly before 9:00 P. M. a 1954 Plymouth being driven by a colored person was seen approaching the vicinity of Uebelsteadt's home where it came to a stop. A few minutes later a pick-up truck left the vicinity of Uebelsteadt's home, proceeded to the Chemstrand Road, where it turned north on the Chemstrand Road and proceeded on in that direction. In a short period of time the pick-up truck returned to the place from which it started and in a few minutes the Plymouth left and proceeded

to the Chemstrand Road and turned south on that road. No arrests were made or were attempted to be made on this night based upon the information leading to this undercover activity.

Uebelsteadt offered testimony, which, if true, proved he was not at his home on the night of May 16, 1961, and could not have been the driver of the truck that left the vicinity of his home on that night. He offered further testimony that his brother, who lived next door to him, owned a Chevrolet truck that was almost identical in looks to his G.M.C. truck. As far as this case is concerned, it is of no importance who was the driver of the truck on the night of May 16, 1961, and the Court finds it unnecessary to decide whether Pete Uebelsteadt was in fact or not the driver of the truck on that night.

On May 17, 1961, State Beverage Agent Harris again received information from the same confidential and reliable source that the 1954 Plymouth Sedan would return on that night to the vicinity of Pete Uebelsteadt's home for the purpose of picking up more moonshine whiskey. On this second occasion the officers returned to the vicinity of Uebelsteadt's home with a large number of other officers to assist them on this occasion. The officers testified that they believed that the truck on the night of the 16th picked up the moonshine whiskey at the residence of Kermit Phelps, who they testified was known to have a record and reputation as a liquor law violator. They therefore stationed agents all along the roads from Pete Uebelsteadt's home to the Phelps home.

As the confidential informer had advised, shortly before 9:00 P.M. the 1954 Plymouth, again being driven by a colored person, came from the south on Chemstrand Road and went to the vicinity of Pete Uebelsteadt's home. A short time later a pick-up truck left the vicinity of Pete Uebelsteadt's home and proceeded to the Chemstrand Road, where it turned north and drove to a point on the Chemstrand Road where the driveway to Kermit Phelps' home leaves the highway and proceeds to the Kermit Phelps home.

When the pick-up truck reached this point, instead of turning in to the Kermit Phelps driveway, it turned in the opposite direction, drove a short distance from the Chemstrand Road, turned around, turned off its lights, cautiously approached and crossed the Chemstrand Road, proceeded up the Kermit Phelps driveway to his garage where it stopped. Immediately a light went on in the garage and in only a few minutes the person who turned on the light came back out, turned off the light, put something in his truck, got in the truck and proceeded back toward the Chemstrand Road with the lights on his truck still turned off. When he reached the Chemstrand Road, he turned south with his lights still off. When he got back on the Chemstrand Road, he turned them on again and proceeded south down that road to the point where he turned left onto the road that led toward the vicinity of Pete Uebelsteadt's home.

Two or more Beverage Agents stationed in an automobile at the point where the Kermit Phelps road enters the Chemstrand Road fell in behind the truck and followed it all the way until it turned left onto the road leading to Pete Uebelsteadt's home. As soon as it got off the Chemstrand Road, the officers stopped the truck, arrested the driver, who was found to be Pete Uebelsteadt, and examined the contents of the truck. In it were found five one-gallon jugs of moonshine non-taxpaid whiskey. The officers seized the moonshine whiskey, also seized the pick-up truck, and took it and Uebelsteadt back to the Kermit Phelps home for the primary purpose of arresting Kermit Phelps for the sale and delivery of this moonshine whiskey.

Upon arriving at the Phelps' garage, one of the officers got out of his automobile and Mrs. Phelps at the same time appeared on a balcony of her upstairs apartment over the garage and demanded what the officers wanted. She was informed that they were there to arrest Kermit Phelps. She advised them that Mr. Phelps was not at home and had not been at home any time that evening.

When the officers drove up to the Phelps' garage which was open at the time, the lights from the automobiles made clearly visible to them evidence of moonshine activity in and around the garage, and they promptly notified Mrs. Phelps they were going to search the place. She asked them if they had a search warrant. They advised her they did not and she suggested they should wait until they got a search warrant before they made the search. They refused to obey her request and proceeded with the search. There was in plain view of them from where they stood outside the garage a large quantity of sugar, which upon seizure turned out to be sixty-nine 60 lb. bales, totalling 4,140 lbs. From that point on, the officers went on to make a complete search of all the rooms in the garage and of an outhouse, in which a 150 gallon wood and metal still-pot, one pipe burner, one 25 gallon butane tank and twelve 55 gallon wooden barrel fermenters were located. The officers found 600 gallons of fermenting mash, 92 gallons of non-taxpaid distilled spirits and numerous one-gallon and five-gallon empty jugs and other accessories that go along with a still operation such as this. All the material pertaining to a still operation found in and around the garage was seized by the officers.

In the Uebelsteadt case, the motion filed by defendant Uebelsteadt is to suppress the evidence seized by the Federal Officers at the time of his arrest and the seizure of the automobile. In the Phelps case, the motion is to suppress substantially all the evidence seized by the officers at the time of the search of his premises. The question presented by the motion in each of these two cases is whether the search and seizure was legal.

### Conclusions of Law

On January 22, 23, and 25, 1962, the Court heard considerable oral testimony concerning the motions filed by these defendants to suppress the evidence seized by the Federal Internal Revenue Officers, and counsel for the respective parties have filed in these cases able briefs, citing numerous cases pro and con as to the validity of these searches and seizures.

The Court has, on this and many other occasions, considered many of these cases and is familiar with what sometimes appears to be conflicting holdings on the law applicable thereto. It is well established law that probable cause exists warranting a search and seizure where the facts and circumstances within the officers' knowledge and of which they have reasonable trustworthy information are sufficient in themselves to warrant belief by a man of reasonable caution that a crime is being committed. The variation in the opinions of the several Courts is whether or not they agree with the Trial Judge that the information was sufficient to warrant the belief by a man of reasonable caution that a crime was being committed.

Without elaborating on these cases, I find and hold that under all the circumstances as shown by the evidence in these cases that the officers had reasonable trustworthy information sufficient to warrant a belief by a man of reasonable caution that a crime was being committed by each of these defendants at the time of the searches and seizures in their cases. Without analyzing the long list of opinions cited by the respective parties, this Court relies upon Bruner v. United States, 293 F.2d 621, a Fifth Circuit case decided by this Court on October 2, 1961, and the cases therein cited.

In passing upon the validity of the search of the Kermit Phelps premises, it is important that the Court keep in mind that the residence occupied by Kermit Phelps and his wife was over the garage, which itself was open to the public; that no search whatever was attempted to be made of the home, and Mrs. Phelps was molested in no way whatsoever except insofar as she was upset by the presence of the officers making the search.

Counsel for defendant Phelps justifiably criticizes the conduct of the officers in carrying out the search. They

went far beyond what was necessary for them to do in completing the search by breaking the locks on the doors of a number of stalls in the garage and examining the contents thereof, none of which contained any contraband material. But this action on the part of the officers in no way affects the validity of the seizures made by the officers.

Without further laboring the point, the Court holds that the search and seizure in each case was a valid search and seizure, and that the motions to suppress should be denied.